## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| **LISA LAROCCA,** | § | |
| *PLAINTIFF,* | § | |
| | § | **C. A. No.: 3:20-cv-00134** |
| **V.** | § | |
| | § | |
| **ALVIN INDEPENDENT** | § | **JURY TRIAL DEMANDED** |
| **SCHOOL DISTRICT,** | § | |
| *DEFENDANT.* | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

**TO THE HONORABLE COURT:**

This action is filed on behalf of Lisa LaRocca, Plaintiff, against the Alvin Independent School District, Defendant. This action arises from Defendant's violation of Plaintiff's rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, *et seq.* In support of Plaintiff Lisa LaRocca's First Amended Complaint, she respectfully submits the following:

### A. PARTIES

1.     Plaintiff is Lisa LaRocca (hereinafter "Mrs. LaRocca" or "Plaintiff"). Plaintiff is a resident of Galveston County, Texas and resides at 3202 Ashe Creek Drive, League City, Texas 77573. Plaintiff may be served by and through her attorney of record: Susan H. Soto, Susan Soto Law, PLLC, 6300 West Loop South, Suite 405, Bellaire, Texas 77401.

2.     Defendant Alvin Independent School District (hereinafter "AISD" or "the school district") is a governmental entity, doing business in the State of Texas, with its principal place of business in Alvin, Texas. Defendant may be served by and through its attorney of record: Amy Demmler, Rogers Morris & Grover, 5718 Westheimer Road, Suite 1200, Houston, Texas 77057.

### B. JURISDICTION & VENUE

3.     This Court has jurisdiction over the lawsuit because the action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, *et seq*. Defendant violated Plaintiff's rights by violating Title VII and discriminating against Mrs. LaRocca as her employer, on the basis of national origin.

4.     Venue is proper in this district under 28 U.S.C. § 1391 because Defendant was doing business in Galveston County, Texas at the time of the incidents that form the basis of this lawsuit and a substantial part of the acts and omissions giving rise to Mrs. LaRocca's claims occurred in this Judicial District.

5.     Plaintiff exhausted her administrative remedies through a dual filing with AISD and with the Equal Employment Opportunity Commission.

In those proceedings, Plaintiff raised the Title VII national origin discrimination claims and retaliation claims she now raises in this Complaint.

## C. CONDITIONS PRECEDENT

6.     All conditions precedent have been performed or have occurred. On January 29, 2020, the Civil Rights Division of the U.S. Department of Justice issued a "Notice of Right to Sue Within 90 Days" in response to Mrs. LaRocca's charge, which was originally filed with the Equal Employment Opportunity Commission. This Complaint is hereby timely filed.

## D. FACTS

7.     At all times material to this action, Mrs. LaRocca was employed by the Alvin Independent School District. Mrs. LaRocca dedicated more than three years of hard work and exemplary service to AISD. Through her hard work and dedication, she honored the Texas Educators' Code of Ethics during her service to AISD, treating board members, faculty members, students, and the general public with care, dignity, loyalty and respect.  Plaintiff had planned on continuing her dedicated and honorable service to AISD for many years to come.

8.     Plaintiff began her career with AISD in 2015 as a Career and Technology Education ("CTE") / Business teacher at Manvel Intermediate School.

9.     During the 2017-2018 school year, Mrs. LaRocca was assigned to Alvin High School as an Engineering and Design, Civil Engineering and Architecture and Professional Communications teacher in the CTE department. The assistant principal in charge of the CTE department that year was Heather Heil. Mrs. LaRocca had many conversations with Heil throughout the school year regarding the manner in which LaRocca's co-workers treated her. The only advice that Mrs. LaRocca received from Heil is "to keep showing her [LaRocca's] kind heart and they will come around."

10.     Heil also told Mrs. LaRocca that Mrs. LaRocca's colleagues in CTE were "probably jealous" of her and that her co-workers were not used to "people like her." Heil told Mrs. LaRocca that she is "different," "Italian," with a different accent, and that Mrs. LaRocca needed to "turn down her 'New York." In Heil's opinion, Mrs. LaRocca stood out and she reminded Mrs. LaRocca that she was "now in Alvin, Texas." Heil also reported to Mrs. LaRocca that co-workers complained to her about the way Mrs. LaRocca dressed. Mrs. LaRocca stated that she dressed professionally, so Heil told Mrs. LaRocca that she was "too curvy." Heil commented that other teachers dress in stretchy pants and t-shirts with their chests spilling out of the top, which no one was looking at because they are "fat," but that Mrs. LaRocca needed to be "careful."

11.    Heil's handling of the situation was punctuated by her giving a copy of the book, <u>The Subtle Art of Not Giving a Fuck</u>, by Mark Manson, to Mrs. LaRocca to read in order to better handle the discriminatory treatment her co-workers were demonstrating.

12.    At the end of the 2017-2018 school year, Heil told Mrs. LaRocca that Mrs. LaRocca would be in a new position for the following school year, but Alvin High School principal Johnny Briseño told Mrs. LaRocca that the position Heil had notified her about never existed. School district administrators strung Mrs. LaRocca along and her position for the upcoming school year changed three times before school began in August 2018, making it too late for her to look for another job.

13.    Mrs. LaRocca was eventually assigned to teach Professional Communications classes in the morning, then she was expected to go to In-School Suspension and pull special education students to provide oral test administration and to help students with their schoolwork in the afternoon. She was also given the responsibility of "Special Education Case Manager," requiring her to carry a case load of special education students and be responsible for their documentation and paperwork. Mrs. LaRocca was not trained in the responsibilities involved with the Case Manager role prior to the start of the 2018-2019 school year.

14.     On September 2, 2018, Mrs. LaRocca reviewed case files in her role as a Case Manager and discovered that there were issues with the special education paperwork for many students – pages were missing and other pages were repeated in place of the ones that were missing. Mrs. LaRocca reported this to Amy Hughey, the special education department chairperson, who responded by commenting how "observant" Mrs. LaRocca was. Hughey said that the paperwork errors were "just a mistake" that would be fixed. These paperwork errors equate to non-compliance with special education policy and law regarding student records.

15.     Eight days later, on September 10, 2018, Mrs. LaRocca went through her case folders again because she had not heard back from Hughey. All folders still contained the same errors in documentation. Mrs. LaRocca reported the problem to Hughey again, who said that she "guessed she needed to re-train everyone."

16.     On October 1, 2018, Mrs. LaRocca received an email notice from Hughey that Mrs. LaRocca's first ARD meeting (Admission, Review, Dismissal or "ARD," in reference to the special education program) was scheduled for the next morning.

17.     Still needing to be trained on Case Manager responsibilities, Mrs. LaRocca did not complete the paperwork for the October 2, 2018 ARD

meeting. Hughey did the paperwork, but she insisted that Mrs. LaRocca sign the documents. Mrs. LaRocca complied, only because she was fearful of losing her job. This, too, is a compliance issue.

18. On October 3, 2018, Mrs. LaRocca emailed Hughey and asked for a date for Case Manager training.

19. On October 8, 2018, a male student approached Mrs. LaRocca in the hall and gave her a one-armed "side hug" as he said hello to her. After saying goodbye, the student continued towards his behavior teacher, Amanda Williams, who was upset by the exchange between the student and Mrs. LaRocca, went to loudly complain about Mrs. LaRocca to assistant principal Aaron Webb. Webb allowed Williams' unprofessional behavior to continue in front of students. Mrs. LaRocca went to the special education department office to report Williams' unprofessional behavior and suggested that if Williams had a complaint about her, she should take it up directly with Mrs. LaRocca.

20. On October 9, 2018, Mrs. LaRocca was put on administrative leave, accused of an "inappropriate hug" with a male student. Williams had made it sound as if what had occurred was "inappropriate." Additionally, the special education departmental secretary, Juanita, claimed that Mrs. LaRocca

"threatened" Williams when she reported Williams' behavior in the department office.

21.     Students reported to Mrs. LaRocca that teachers were making disparaging comments and gossiping about Mrs. LaRocca in front of them. Mrs. LaRocca notified assistant principal Cavin Davis, her supervisor, of same via email. He never responded to her concerns.

22.     Mrs. LaRocca was cleared of any wrong-doing and returned to work on October 17, 2018. When she returned to campus, she recognized that the pattern of treatment she was receiving was in retaliation for her speaking out about the problematic special education student folders; she even found her name plate ripped off of the wall in front of her classroom and tossed on the floor. When she reported it to administration, she was told it was due to "humidity," but strangely, her name plate was the only one in the entire building that had supposedly been affected by the "humidity!"

23.     Also, on October 16, 2018, she reached out to principal Briseño via email about the issues she was having with her co-workers and the hostile work environment she was forced to endure. They met on October 17, 2018 to discuss her concerns, with assistant principal Davis also in attendance. During the meeting, Briseño said that he hoped that Mrs. LaRocca would be able to work with the special education department "like a professional." Mrs.

LaRocca, shocked at the insinuation that she might be unprofessional, responded by assuring him that she, of course, would be able to, and that she had always conducted herself in a professional manner. Mrs. LaRocca asked him if he was so worried about *her* behavior, what about her co-workers in the special education department? His reply was, "Of course they will." Briseño had no reason to only be concerned about Mrs. LaRocca's degree of professionalism to the exclusion of that of her co-workers.

24.    Davis issued a memorandum to Mrs. LaRocca on October 16, 2018 and directed her to not, "under any circumstances," enter the special education office or any of the behavior classes. Then, on October 18, 2018, Davis emailed Mrs. LaRocca and told her to resume her normal daily routine.

25.    Defendant's employees continued to harass and intimidate Mrs. LaRocca upon her return to campus. At a football game on October 19, 2018, Davis stood in proximity to Mrs. LaRocca, stared at her and watched her during the entire game. Two of Mrs. LaRocca's former students stopped to visit with Mrs. LaRocca and noticed Davis's strange behavior, as well. They characterized it as looking like a "stalker" and they were extremely uncomfortable with his behavior.

26.    On October 23, 2018, Davis emailed Mrs. LaRocca again, this time to renew the restrictions he previously placed on her – she was not to

enter the special education office or behavior classrooms. These restrictions made it almost impossible for Mrs. LaRocca to do her job. The next day, Mrs. LaRocca emailed Davis and explained that she felt very uncomfortable speaking to him about her concerns with the special education department and would speak with Briseño.

27.   On October 25, 2018, Mrs. LaRocca had a discussion with Briseño in the cafeteria about an incident that occurred earlier that morning with special education co-workers and asked him to look at the security camera footage, so he could see for himself how she was being treated. Before students had arrived, Mrs. LaRocca was on her way to the restroom when she encountered a group of special education department co-workers gathered in a group in the hallway, talking. Once they saw Mrs. LaRocca approach, they stopped talking and stared at her, making her feel singled out and uncomfortable. She rushed into the restroom to escape the uncomfortable situation, and as she closed the door, the group began to laugh. When Mrs. LaRocca opened the door to exit, the group of co-workers was whispering to each other, then they stopped talking altogether and stared at her again. Once Mrs. LaRocca walked away, some in the group laughed again. Mrs. LaRocca stressed to Briseño during their conversation in the cafeteria that even though he was worried about *her* being professional, he should look at the security

camera footage to see that it was her co-workers, not her, who are the problem. He said he would look later that day.

28.     On October 26, 2018, Mrs. LaRocca emailed Briseño to inquire about filing a report of a hostile work environment. She also asked him if he looked at the security camera footage of the incident to see how she had been treated; he said he was too busy, but that he would look sometime in the future. Mrs. LaRocca never heard from Briseño again regarding the incident with her co-workers; he chose to ignore the incident, as he did with everything else that concerned Mrs. LaRocca and the discrimination that his staff was exhibiting.

29.     Throughout the month of October 2018, Mrs. LaRocca emailed Hughey several times about access to the ARD paperwork software, when ARDs were scheduled, etc., with no result. This not only prevented Mrs. LaRocca from completing her job assignments, it also created further compliance issues with special education program rules and regulations.

30.     On October 30, 2018, Mrs. LaRocca met with principal Briseño about the continuous hostile work environment. Now the staff restroom near the special education office was locked every day, and the special education department secretary kept the key. The secretary knew that Mrs. LaRocca was not permitted to enter the special education office, so when she saw Mrs. LaRocca try the restroom door in hopes of gaining access, she would look out

of the office window into the hall and smirk at Mrs. LaRocca. Mrs. LaRocca developed abdominal pains from having to contain her urine until the afternoon, as her teaching schedule made it impossible to travel to a different restroom located further away in the building during the school day. Days later, Briseño had a key made for Mrs. LaRocca, so she could have access to the staff restroom. Clearly, he knew Mrs. LaRocca was telling the truth about how she was being treated, or he would not have made a key for her. No other teacher had his or her own key to the restroom, because all teachers -- except Mrs. LaRocca -- had access to the office and to the key kept there. Mrs. LaRocca, due to the discriminatory and retaliatory restrictions placed on her, did not.

31.     On November 27, 2018, Mrs. LaRocca emailed assistant principal Aaron Webb to inquire about training for the Case Manager position, since she started the position in August but had yet to be trained. He never responded.

32.     On November 29, 2018, Amy Hughey emailed Mrs. LaRocca and directed her to not attend the special education department meeting; since Mrs. LaRocca was not allowed in the office area, Hughey offered to go over the information from the meeting with Mrs. LaRocca separately. That never happened. Worse, the principal asked Mrs. LaRocca why she had missed the

meeting, and Mrs. LaRocca told him it was because she was told not to attend, since Davis had also emailed the restrictions on Mrs. LaRocca to Hughey. The principal was confused, because he had only been copied on the email that returned Mrs. LaRocca to normal duties, not the subsequent email with restrictions sent on October 23, 2018. Mrs. LaRocca told the principal that she had been placed on restrictions limiting her access to her department; he was unaware. Her exclusion from the departmental meeting further impeded her ability to do her work.

33.     In early December 2018, Mrs. LaRocca had a conversation with A.D., a female special education student after seeing A.D. in the hall. A.D. was upset and told Mrs. LaRocca that her Individual Education Plan was not being followed. A.D. was concerned because she was already nineteen years old at the time, feared that she was never going to graduate, and did not want to be twenty years old and a high school senior "again." Mrs. LaRocca escorted A.D. to Amy Hughey's office so that A.D.'s concerns could be addressed by the department head, but Hughey was not there, so the two spoke with Jay Morris, who worked with Hughey. A.D. and Mrs. LaRocca told him that A.D.'s educational plan was not being followed (as federal law requires) and Morris told Mrs. LaRocca that he would handle it, then told Mrs. LaRocca that she could "leave" the office.

34.     On December 19, 2018, Mrs. LaRocca had a cordial, pleasant conversation with Hughey at the staff Christmas luncheon. Principal Briseño was only a few feet away from the two women while they visited. The conversation at the luncheon took place just a few days after Mrs. LaRocca reported another special education compliance issue (this time, with A.D.'s instructional program); Mrs. LaRocca did not anticipate that Hughey would twist the pleasant conversation into an opportunity for further retaliation against Mrs. LaRocca for speaking up about the school's repeated failure to adhere to federal and state special education law.

35.     After the Winter Break, on January 8, 2019, Briseño interrupted Mrs. LaRocca's class and explained that another complaint from the special education department had been filed against her. This time, Hughey complained that Mrs. LaRocca had approached her at the Christmas party, made her feel uncomfortable, and cursed at her. Briseño accompanied Mrs. LaRocca to an office on campus where Syreeta Presley, an AISD employee from the human resources department, was waiting.

36.     Presley alleged a "pattern" with Mrs. LaRocca and demanded a letter of resignation from Mrs. LaRocca by the end of the week. Presley told Mrs. LaRocca that if she did what Presley wanted her to do, she [LaRocca] would be allowed to finish out the school year and would receive "glowing"

recommendations and a reference letter from the superintendent. However, if Mrs. LaRocca did not comply, Presley said she would recommend Mrs. LaRocca's termination at the next Board of Trustees' meeting, "in front of everyone," including the local newspaper, Mrs. LaRocca's name would appear in the newspaper, she would not be able to get another job because everyone would know about her history in AISD, and she would lose her benefits.

37.     At this point, Mrs. LaRocca was scared and traumatized. She had already been escorted out of the school building at the start of the earlier administrative leave and humiliated, disparaged and defamed by co-workers, discriminated against because she is of Italian descent, retaliated against for speaking up about issues in the special education department, harassed, and subjected to a hostile work environment – she felt she simply could not take any more stress. She agreed to Presley's demand, under duress, and wrote a letter of resignation on January 10, 2019.

38.     Mrs. LaRocca emailed Briseño on January 11, 2019, reminding him that he was standing close to her and Hughey the entire time that the luncheon incident allegedly took place and asked him to schedule a meeting for them to discuss it. Briseño returned her email that day and said it was important to find out why Hughey said what she did and admitted that he was,

indeed, a few feet away from where the incident between Hughey and Mrs. LaRocca allegedly took place and that he did not hear anything "out of the ordinary."

39.     Mrs. LaRocca met with Briseño on January 17, 2019 and sent a follow-up email to him. She was still trying to clear her name from the false accusation made against her by Hughey. Presley was delaying completing her investigation into the matter, and Mrs. LaRocca only had a limited amount of time to file a grievance in the matter. Mrs. LaRocca never heard back from either of them regarding the situation.

40.     Mrs. LaRocca rescinded her resignation via email on January 24, 2019. Later that day, she received certified U.S. Mail with the school district's acceptance of her resignation.

41.     Throughout the month of January, Mrs. LaRocca continued to ask Hughey for training on Case Manager duties in person and via email; Hughey would delay or avoid the conversation.

42.     On January 28, 2019, Mrs. LaRocca received an email from Ellen Coate, a homebound services teacher, notifying Mrs. LaRocca that Coate had placed a homebound student's completed assignments in Mrs. LaRocca's campus mailbox and that they were missing. Several times, items

from Mrs. LaRocca's mailbox came up missing, including students' work and attendance verification sheets, which Mrs. LaRocca was required to complete.

43.    On February 21, 2019, another teacher, First Sgt. Garcia, spoke negatively and disrespectfully about Mrs. LaRocca in front of the male and female MCJROTC competition teams, whom Mrs. LaRocca chaperoned when they competed on weekends. The students knew Garcia's behavior was wrong and reported it to Mrs. LaRocca; Heil was present while he spoke about her and despite being teacher's boss, allowed it by doing nothing to address the issue with the students or the teacher.

44. On February 26, 2019, Mrs. LaRocca was excluded from an ARD meeting, even though she was the student's CTE teacher and should have been in the meeting. The parent was told not to discuss the ARD meeting with anyone, which is not required by law; parents have the right to talk about an ARD meeting with whomever they like. Presumably, this misrepresented instruction to the parent was to prevent her from seeking help and advice from Mrs. LaRocca.

45.    Mrs. LaRocca was excluded from a training by Heil on February 26, 2019. Mrs. LaRocca had registered for the training on Feb. 19, but Heil withdrew her from the training on Feb. 26. Heil, for some reason, did not want LaRocca to attend. Webb sent Mrs. LaRocca an email, instructing her to

attend a different training, which did not involve either the CTE or special education departments. This further impeded Mrs. LaRocca from doing her job.

46.     On February 28, 2019, Mrs. LaRocca was pulled from class and walked to the principal's office, where Presley was waiting. Mrs. LaRocca was accused of being a "disruption to the educational process" – students were upset that Mrs. LaRocca was leaving the school at the end of the year and they emailed the principal to express their concern. They reported that Mrs. LaRocca told them that she had resigned her position but then later rescinded her resignation. Mrs. LaRocca admitted that she told her students that, because they asked her about it and she told them the truth. She commented further that if teachers on campus would stop telling students that she had been fired, or that she quit because she did not want to be there, or because she had been inappropriate with a male student (all things that her students had told her), then she would not have to address her employment status with students at all. Mrs. LaRocca expressed her frustration with the principal and pointed out that harassment by the faculty had continued, despite the fact that she reported it to him on many occasions.

47.     Presley said there would be an investigation, but at the same time intimated that Mrs. LaRocca would not be returning to campus at all. Presley

collected Mrs. LaRocca's identification badge, school keys, and computer. Mrs. LaRocca was escorted to her car for the second time that school year, humiliated in front of co-workers and students. Mrs. LaRocca was never informed of the outcome of any investigation, she spent the rest of the semester at home and a substitute teacher, who is the brother of another CTE teacher, was put in Mrs. LaRocca's place. That substitute teacher is now a full-time CTE teacher at the school.

48.     Earlier in the 2018-2019 school year, an Alvin High School teacher and the student teacher who was being mentored by the teacher were walking down the hall where Mrs. LaRocca's classroom was located; Mrs. LaRocca was teaching and the door to her classroom was open. As the two adults walked past, the teacher started talking about Mrs. LaRocca with the student teacher and commented about Mrs. LaRocca being Italian and from New York, and about her accent. The teacher mimicked Mrs. LaRocca's accent and the student teacher laughed. One of Mrs. LaRocca's students was behind them, and the student went to Mrs. LaRocca, upset, to tell her what she saw and heard. The student shared with Mrs. LaRocca that she wanted to "stick up" for Mrs. LaRocca, but that she was afraid to get in trouble for doing so. Mrs. LaRocca praised the student for doing the right thing and told her that she [LaRocca] did not want the student to get involved further. The student

insisted on taking action, so Mrs. LaRocca counseled her to go to the assistant principal's office to file a report. The student reported the following day that when she went to the office, Karen Taylor[1] spoke with the student about the student's concerns and said she would speak to the teacher about the incident. Mrs. LaRocca does not believe that the teacher was spoken to, as the teacher never came to her to apologize, nor did Taylor ever come to her to follow up and confirm that the matter had been dealt with.

49.     Many of Mrs. LaRocca's students at Alvin High school told her about similar incidents – it was a regular occurrence. The students were so upset by the way Mrs. LaRocca's co-workers treated and gossiped about her that they put together a petition with approximately two hundred and fifty signatures and submitted it to Briseño on Mrs. LaRocca's behalf. The students knew Mrs. LaRocca was being singled out because of her national origin, as did the administration; the children took action, the administration did nothing.

50.     During one of her many meetings with Briseño during the 2018-2019 school year, Mrs. LaRocca specifically asked him why her co-workers treated her so badly. She complained that the associate principal's secretary, Sherry Kreft, had two felony charges for check fraud on her record but was

---

[1] Taylor was then an assistant principal and has since become principal at Alvin High School.

allowed to work in peace while she [LaRocca] had done nothing wrong and was discriminated against, harassed by, and retaliated against by co-workers on a regular basis. Briseño's only explanation was that the staff was willing to work with Kreft. This upset Mrs. LaRocca greatly, so she clarified the situation by asking if her co-workers were willing to work with a criminal – a felon – but not "an Italian girl from Brooklyn." Briseño did not answer, which is an answer in and of itself.

51.     Also during the 2018-2019 school year, after helping Agricultural Science teacher C. Jennings, Mrs. LaRocca commented that she [LaRocca] is not a bad person and that Jennings did not have to "hate" her. Jennings told Mrs. LaRocca that she did not hate her but admitted that she would roll her eyes at her because she was "different." Jennings told Mrs. LaRocca that she was not used to people like Mrs. LaRocca, "You're Italian … and your accent … and being from New York."

52.     Student Carlee Robicheaux overheard teachers talking about Mrs. LaRocca numerous times, including Agricultural Science teacher Courtney Webb, who discussed Mrs. LaRocca with other teachers and with students. Mrs. Webb is assistant principal Aaron Webb's wife and is pursuing a Master's degree in Educational Leadership. Carlee overheard Mrs. Webb say that Mrs. LaRocca is "different" and heard conversations that Mrs. Webb

participated in and in which comments were made such as: the persons in the conversation did not "like" Mrs. LaRocca, that she did not "fit in," and that Mrs. LaRocca's Italian / Brooklyn accent was "weird" and they did not like it.

53.    On March 29, 2019, the Texas Education Agency found that Alvin High School was out of compliance with special education law, confirming Mrs. LaRocca's complaints and concerns about the special education department and its files.

54.    Mrs. LaRocca filed a grievance based on the discrimination, harassment and retaliation she endured and administrative hearings on the matter were held on February 14, 2019, March 21, 2019, May 1, 2019 and August 15, 2019. Mrs. LaRocca alleged in her written grievance that she had been subjected to a hostile work environment, sexual harassment, unfair reprimands, unfair treatment as compared to other staff members, and negative comment about her national origin. *See, e.g.,* AISD Level 1 Grievance Dec., undated.

55.    Mrs. LaRocca also filed a report with the Equal Employment Opportunity Commission ("EEOC") on March 6, 2019.

56.    In her March 2019 EEOC charge against AISD, Mrs. LaRocca described allegations made against her two days after she "advocated for a

SPED student because the SPED department was not following the student's IEP." She also explained that when she worked to comply with her students' IEPs, going against the custom and culture at the school of non-compliance with special education rules, regulations and law, she was "blacklisted."

57.     In her September 2019 EEOC claim, Mrs. LaRocca indicated five areas that formed the basis of her complaint. She checked off the following areas of workplace discrimination to which she had been subjected: discrimination based on race/color, discrimination based on national origin, discrimination based on sex, discrimination based on age, and retaliation because she filed a complaint or asserted her rights.

58.     On November 20, 2019, Mrs. LaRocca received correspondence from the EEOC that explained that her case had been forwarded to the U.S. Department of Justice.

59.     Mrs. LaRocca received her Right to Sue letter from the U.S. Department of Justice, dated January 29, 2020, on February 6, 2020.

### E.  CAUSES OF ACTION

60.     Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 7-59, above, as if fully set forth herein.

61.     Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer "(1) to fail or refuse to hire or to discharge any

individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

## COUNT 1
## TITLE VII, 42 U.S.C. § 2000E-2(a)
## HOSTILE WORK ENVIRONMENT BASED ON
## NATIONAL ORIGIN

## <u>VIOLATIONS OF TITLE VII</u>

62.     Plaintiff was discriminated against and harassed by supervisors and co-workers based on her national origin. She was subjected to unequal terms and conditions of her employment and subjected to disparate treatment, including being banned from the departmental office and being locked out of the restroom to which her colleagues had free access. She was treated less favorably than her co-workers who were not of Italian descent in disciplinary actions and opportunity for professional development.

63.     The discriminatory statements and conduct to which Mrs. LaRocca was subjected were unwelcome, sufficiently severe or pervasive,

and they detrimentally affected Mrs. LaRocca. The comments and conduct were viewed as subjectively hostile by Mrs. LaRocca and would be viewed as objectively hostile and abusive to a reasonable person.

64.     Plaintiff complained numerous times to AISD administrators about the discrimination and harassment, and AISD had actual or constructive knowledge of the ongoing discrimination and harassment.

65.     Alvin ISD failed to take prompt and appropriate remedial action to prevent or correct further discrimination and harassment of Mrs. LaRocca.

66.     Alvin ISD discriminated against Mrs. LaRocca on the basis of her national origin in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a).

67.     Defendant's unlawful acts have caused Plaintiff economic damages in the form of income, benefits, and consequential damages in an amount to be proved at trial.

68.     Defendant's unlawful acts have caused Plaintiff non-economic damages in the form of physical illness, injury to reputation, personal humiliation, and mental anguish and suffering, to be proved at trial.

69.     Pursuant to 42 U.S.C. § 2000e-5(k), Plaintiff is entitled to costs, disbursements, and reasonable attorney's fees incurred.

## PLEADING STANDARD FOR NATIONAL ORIGIN DISCRIMINATION CLAIMS

70.     The U.S. Supreme Court has distinguished the *McDonnell Douglas* evidentiary standard from the plausibility pleading standard of *Twombly* and *Iqbal* in national origin discrimination claims. *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019). While a plaintiff is not required to submit evidence that establishes a *prima facie* case of discrimination in her initial pleadings, she must plead "sufficient facts" on the "ultimate elements of a disparate treatment claim" to make her case plausible. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 470 (5th Cir. 2016).

71.     The Fifth Circuit has established two "ultimate elements" that a plaintiff must plead: first, an adverse employment action, and second, the action was taken against the plaintiff "because of her protected status." *See Cicalese*, 924 F.3d at 767 (quoting *Raj v. La. State Univ.*, 714 F.3d 322, 331 (5th Cir. 2013)). Here, Mrs. LaRocca pleads numerous adverse employment actions: excessive and unwarranted suspensions from duty, exclusion from the special education office and departmental meetings, and separate restroom facilities. These adverse actions were taken against her because of her protected status, as evidenced by Heil's, Jennings' and Webb's comments about Mrs. LaRocca's national origin and the derogatory

- 26 -

conversations about Mrs. LaRocca's national origin that were witnessed by both teachers and students.

72.     A court errs in holding a plaintiff to a heightened pleading standard similar to the rigorous factual analysis within the *McDonnell Douglas* framework at the initial stages of a discrimination claim. *See Cicalese*, 924 F.3d at 767. After counsel for AISD notified Mrs. LaRocca's counsel of AISD's intent to file a Rule 12(b) motion to dismiss pursuant to the Court's Local Rule 6, and after a review of binding precedent, Mrs. LaRocca is confident that she has met the pleading standard by showing the plausibility of her claims against AISD. The adverse employment actions taken against Mrs. LaRocca because of her protected status, as set forth in paragraphs 7-59 *supra*, are re-alleged and incorporated by reference.

## COUNT 2
## TITLE VII, 42 U.S.C. § 2000E-3(a)
## RETALIATION FOR ENGAGING IN PROTECTED ACTIVITY

## RETALIATION AGAINST MRS. LAROCCA

73.     Mrs. LaRocca participated in protected activity when she complained about discrimination and harassment based on national origin to AISD administrators.

74.     Mrs. LaRocca participated in protected activity when she complained about non-compliance with special education laws governing

documentation and paperwork to campus special education department staff and AISD administrators.

75.   Mrs. LaRocca participated in protected activity when she complained about the lack of training for the job assignment she was given as a Special Education Case Manager.

76.   In retaliation for Mrs. LaRocca's complaints, AISD changed her job assignment, changed her job duties, and imposed terms and conditions that were not imposed on other employees.

77.   There is a causal connection between Mrs. LaRocca's complaints and the materially adverse actions taken against Mrs. LaRocca by AISD.

78.   Furthermore, the retaliation endured by Mrs. LaRocca would dissuade and deter a reasonable employee from making complaints of discrimination and harassment or otherwise engaging in protected activity under law.

79.   Defendant AISD retaliated against Mrs. LaRocca for engaging in protected activity in violation of Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a).

### F.  COMMON LAW AND STATUTORY DAMAGES

80.     Plaintiff's damages include all damages available under common and statutory law, including but not limited to, actual damages, lost earnings, attorney's fees, court costs, and interest.

### G.  DECLARATORY AND INJUNCTIVE RELIEF

81.     A present and actual controversy exists between Plaintiff and Defendant concerning their rights and respective duties. Plaintiff contends that Defendant violated her rights under Title VII. Plaintiff is informed and believes, and therefore alleges, that the Defendant denies these allegations. Declaratory relief is therefore necessary and appropriate.

82.     Plaintiff seeks a judicial declaration of the respective rights and duties of the parties.

83.     No complete remedy at law is available to Plaintiff to redress the wrongs alleged herein.

84.     If this Court does not grant the injunctive relief sought herein, Plaintiff will be irreparably harmed.

### H.  JURY DEMAND

85.     Plaintiff demands a jury trial and tenders the appropriate fee with this Complaint.

## I. PRAYER

86.     FOR THESE REASONS, Plaintiff Lisa LaRocca prays that the
Court issue citation for Defendant to appear and answer, that this Court
provide a trial by jury, and that Plaintiff be awarded a judgment against
Defendant for the following:

a.   economic damages;

b.   non-economic damages;

c.   prejudgment and post-judgment interest;

d.   reasonable attorney's fees;

e.   disbursements and court costs; and

f.    all other relief to which Plaintiff is entitled
      and that the Court deems just and proper.

87.     Furthermore, Mrs. LaRocca prays that the Court grant the
following relief:

a.  Enjoin Defendant AISD from:

a)  Subjecting employees to discrimination and

harassment based on national origin; and

b)  Retaliating against employees who engage in activity

protected under Title VII;

b.  Order Defendant AISD to develop and implement

appropriate and effective measures designed to prevent

discrimination, harassment, and retaliation, including but not
limited to policies and training for employees and
administrators;

c. Order Defendant AISD to develop appropriate and effective
measures to receive complaints of workplace discrimination,
harassment, and retaliation, as well as a process for
investigating such complaints; and

d. Award damages to Mrs. LaRocca to fully compensate her
for the injuries caused by AISD's discriminatory, harassing,
and retaliatory conduct, pursuant to and within the statutory
limitations of Section 102 of the Civil Rights Act of 1991,
42 U.S.C. § 1981a.

DATED: June 18, 2020.

Respectfully Submitted,

SUSAN SOTO LAW, PLLC

By: /s/ Susan H. Soto
Susan H. Soto
State Bar No. 24076707
Federal ID No. 1812015

6300 West Loop South, Suite 405
Bellaire, Texas 77401

Telephone: 832-831-9936
Facsimile: 877-231-7331
E-mail: Soto@SotoSchoolLaw.com

*Attorney for the Plaintiff,*
*Lisa LaRocca*

## CERTIFICATE OF SERVICE

As Plaintiff's counsel, I hereby certify that on June 18, 2020, a copy of the foregoing document was electronically filed on the CM/ECF system, which will automatically serve a Notice of Electronic Filing on the following attorney for Defendant in this matter:

Amy Demmler
Rogers Morris & Grover
Suite 1200
5718 Westheimer Road
Houston, Texas 77057

By: /s/Susan H. Soto